## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| JAMIE HEUTON, Individually, and as Administrator of the ESTATE OF ANDREW HEUTON, and as Next Friend of A.H., a minor, ASHLEY HEUTON, and ANDREW HEUTON, JR., | |
| Plaintiffs, | |
| v. | Case No. 24-02065-DDC |
| UNITED STATES OF AMERICA, INSPIRE ENT AND PULMONOLOGY, P.A., ERIC B. PURDOM, D.O., and MICHELLE R. FINCHMAN, M.D., | |
| Defendants. | |

## THE UNITED STATES'S MOTION FOR SUMMARY JUDGMENT

Defendant United States of America ("Defendant" or "United States"), by and through Ryan A. Kriegshauser, United States Attorney for the District of Kansas, and Brian E. Vanorsby and Michelle A. Jacobs, Assistant United States Attorneys, moves this Court for an Order granting judgment in the United States's favor on Plaintiffs' survival and wrongful death claims because the United States is immune from liability and damages under K.S.A. § 60-5503.

## INTRODUCTION AND SUMMARY

Plaintiffs have brought survival and wrongful death claims against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671, *et seq.*, for the alleged negligent medical treatment of the decedent, Andrew Heuton, on March 7, 2022.

Mr. Heuton was diagnosed with a COVID-19 infection in December 2021. This infection was severe, resulting in him being admitted to the ICU with diagnoses of respiratory failure and COVID-19 pneumonia. Mr. Heuton was intubated, extubated, reintubated, and then had a

tracheostomy procedure performed. Mr. Heuton remained under mechanical ventilation until at least February 3, 2022. Although Mr. Heuton was weaned from mechanical ventilation, he continued to have secondary COVID complications through March 7, 2022, when he was transported to Irwin Army Community Hospital (IACH) emergency room by ambulance for trouble breathing. These complications included pneumothorax, tracheal stenosis, pulmonary embolism, and underlying pulmonary scarring and fibrosis. IACH emergency room physician Dr. Travis Jordan, an employee of the United States Department of the Army, treated Mr. Heuton over the course of several hours. The conditions treated by Dr. Jordan were secondary to Mr. Heuton's severe COVID-19 illness, from which he was still recovering. Ultimately, Dr. Jordan discharged Mr. Heuton from the hospital on supplemental oxygen. Shortly after his discharge, Mr. Heuton went into respiratory and cardiac arrest.

Plaintiffs allege that Dr. Jordan was negligent in his treatment and decision to discharge Mr. Heuton on supplemental oxygen. But Dr. Jordan—and thus the United States—is immune from civil liability and damages in this case under the COVID-19 Response and Reopening for Business Liability Protection Act ("CRRBLPA"), K.S.A. §§ 60-5501, *et seq.* The CRRBLPA provides immunity from civil liability for COVID-19-related claims against healthcare providers such as Dr. Jordan. This immunity covers not just the treatment of COVID-19 itself, but also the treatment of conditions caused by or relating to the COVID-19 illness. In this case, there is no dispute that the conditions treated and ultimately leading to Mr. Heuton's death were causally related to his severe COVID-19 infection. Thus, the United States respectfully requests that the Court enter judgment in its favor because it is immune from liability and damages under the CRRBLPA.

## STATEMENT OF UNCONTROVERTED FACTS

1.    Andrew Heuton was diagnosed with a COVID-19 infection in December 2021. This infection was severe, resulting in him being admitted to the ICU with diagnoses of respiratory failure and COVID-19 pneumonia. (Pretrial Order Stipulation, Doc. 101, ¶2.a.v).

2.    Andrew Heuton's COVID-19 illness resulted in him being intubated twice and having a tracheostomy procedure performed. (Pretrial Order Stipulation, Doc. 101, ¶2.a.viii).

3.    Mr. Heuton was not successfully weaned off mechanical ventilation until February 3, 2022. (Select Specialty Hospital Medical Records [cited excerpts attached as Exhibit A], USA_000314, *stipulated document* Doc. 101, ¶2.b.v).

4.    Mr. Heuton's tracheostomy tube was removed on February 9, 2022. (Ex. A, USA_000312).

5.    On February 14, 2022, Mr. Heuton was transferred to a rehabilitation facility for reconditioning. He remained in the rehab facility until February 23, 2022. (Ascension Via Christi Medical Records [cited excerpts attached as Exhibit B], USA_003303-3305, *stipulated document* Doc. 101, ¶2.b.viii).

6.    The following day, on February 24, 2022, Mr. Heuton was found to still be suffering "dyspnea [shortness of breath] with cough" with a need for "numerous consults and assistive devices to help him recover" during a hospitalization follow-up appointment. (VISTA VA Electronic Medical Documentation: Progress Notes [cited excerpts attached as Exhibit C], USA_002059-2065, *stipulated document* Doc. 101, ¶2.b.xv).

7.    Three days later, on February 27, 2022, Mr. Heuton presented to the Via Christi emergency room in Manhattan, Kansas, with shortness of breath and chest tightness. (Ex. B, USA_003008-3012).

8.      Mr. Heuton reported that his problems had "been ongoing since before getting out of rehab." (Ex. B, USA_002982).

9.      Mr. Heuton was diagnosed with severe tracheal stenosis (a narrowing of the trachea) and an acute, partially occlusive and occlusive proximal to distal segmental and subsegmental and subsegmental right lower lobe pulmonary artery embolus, without heart strain on February 27, 2022. (Pretrial Order Stipulation, Doc. 101, ¶2.a.ix).

10.     The "pulmonary findings" during this visit were noted to represent the "resorption phases COVID-19 pneumonia with likely underlying scarring and fibrosis." (Ex. B, USA_003012).

11.     Dr. Eric Purdom of Inspire ENT & Pulmonology performed a full surgical consultation on Mr. Heuton. (Ex. B, USA_002996-3000).

12.     Dr. Purdom's surgical consultation states that Mr. Heuton has pulmonary emboli, tracheal stenosis, and a recent history of acute hypoxic respiratory failure secondary to COVID-19 pneumonia, prolonged intubation requiring tracheostomy, left side pneumothorax, and subsequent critical illness myopathy and polyneuropathy. (Ex. B, USA_002999-3000).

13.     Dr. Purdom recommended a tapered course of prednisone (oral steroid) over the next week and then a follow up at Inspire ENT & Pulmonology. (Ex. B, USA_002999).

14.     For his pulmonary embolism, Mr. Heuton was treated with Lovenox (anticoagulant) and discharged with a prescription for Eliquis (anticoagulant). (Ex. B, USA_002976).

15.     On March 1, 2022, Mr. Heuton called VA care management regarding a consultation, stating that he was told to follow up with an ENT because "[h]is throat is at 50% due to scar tissue from intubation from COVID." (Ex. C, USA_002045-46).

16.    On March 5, 2022, Mr. Heuton again reported to the Via Christi emergency department with complaints of increased shortness of breath and stridor. Mr. Heuton was discharged with a higher dose of steroids to treat his tracheal stenosis. (Ex. B, USA_002932-34).

17.    Mr. Heuton returned to the Via Christi emergency department for a second time on March 5, 2022, with a "respiratory complaint." However, he left prior to triage and was discharged against medical advice. (Ex. B, USA_002924-25)

18.    Mr. Heuton presented to the Irwin Army Community Hospital ("IACH") emergency department on the morning of March 7, 2022, via ambulance, for difficulty breathing. (Pretrial Order Stipulation, Doc. 101, ¶2.a.xi); (Irwin Army Community Hospital Medical Records Part 2 [cited excerpts attached as Exhibit D], USA_005272-74, *stipulated document* Doc. 101, ¶2.b.ii).

19.    The United States, through the United States Department of the Army, operates IACH in Fort Riley, Kansas. (*Stipulated fact*, Doc. 101, ¶2.a.i).

20.    Dr. Travis Jordan was the emergency department physician who provided care to Mr. Heuton at IACH on March 7, 2022. (*Stipulated fact*, Doc. 101, ¶2.a.xii).

21.    Dr. Jordan is a physician licensed by the State of Kansas to provide healthcare services. (Kansas Board of Healing Arts Licensee Profile for Travis D. Jordan [attached as Exhibit E], last updated Aug. 10, 2025, available at https://www.kansas.gov/ssrv-ksbhada/search.html).[1]

22.    Dr. Jordan met with Mr. Heuton the moment he arrived at IACH. Upon arrival, Mr. Heuton reported that he "feels like his airway is narrowed in his throat" and that he has had trouble

---

[1] The Court can take judicial notice of Dr. Jordan's status as a physician licensed to provide healthcare services in the State of Kansas. *See* Fed. R. Evid. 201(b); *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 702 & n.22 (10th Cir. 2009) (taking judicial notice of facts on government websites and observing that "[i]t is not uncommon for courts to take judicial notice of factual information found on the world wide web.") (citation omitted).

breathing "ever since they closed his trach." (Deposition of Dr. Travis Jordan [cited excerpts attached as Exhibit F], pgs. 174-75) (Ex. D, USA_005273).

23.    Mr. Heuton was noted to have arrived at the emergency room on a nonrebreather for supplemental oxygen. (Ex. D, USA_005273).

24.    Dr. Jordan decided to remove the nonrebreather to get an understanding of how Mr. Heuton would respond and to place Mr. Heuton on a lower oxygen flow delivered by nasal cannula. It was noted that at some point Mr. Heuton's oxygen saturation was 89% on room air while standing. Based on these facts, Dr. Jordan understood that Mr. Heuton had hypoxemia. (Dr. Jordan depo. Ex. F, pgs. 19-21, 159); (Ex. D, USA_005273).

25.    It is also noted that some changes in Mr. Heuton's oxygen saturations were positional. For example, Mr. Heuton's oxygen saturations went down if he laid back. (Ex. D, USA_005273).

26.    Through his differential diagnosis, Dr. Jordan came to believe that Mr. Heuton's tracheal stenosis was the primary issue causing the hypoxemia. Dr. Jordan further believed that the administration of steroids would assist with any underlying smaller airway condition that might be contributing. (Dr. Jordan depo. Ex. F, pgs. 78 & 117).

27.    Dr. Jordan did not believe that the pulmonary embolism was causing Mr. Heuton's hypoxemia because it was under treatment for clotting and his body should be breaking the clots down.  (Dr. Jordan depo. Ex. F, pgs. 129-30).

28.    Dr. Jordan observed Mr. Heuton throughout his stay in the ER, stopping in to check on him multiple times, and observed that Mr. Heuton adequately maintained his oxygen saturations while on supplemental oxygen through a nasal cannula. (Dr. Jordan depo. Ex. F, pgs. 163-64).

29.     After consulting with Dr. Eric D. Purdom, Mr. Heuton's ENT specialist, Dr. Jordan ultimately decided that Mr. Heuton could be discharged from the hospital on supplemental oxygen to maintain his oxygen saturations until he could follow up with his ENT specialist in a few days. (Dr. Jordan depo. Ex. F, pgs. 165-67).

30.     Dr. Jordan discharged Mr. Heuton from IACH. (*Stipulated fact*, Doc. 101, ¶2.a.xviii).

31.     Mr. Heuton discharged from IACH at 4:22 pm, which was approximately 8 hours after his arrival at 8:23 am. (Ex. D, USA_005377).

32.     Prior to his discharge at 4:22, Mr. Heuton's oxygen saturations were noted to be at 99 percent on 5L of supplemental oxygen by nasal cannula. (Dr. Jordan depo. Ex. F, pgs. 171-72).

33.     While on the way home, Mr. Heuton requested that Jamie Heuton pull over and call an ambulance. (*Stipulated fact*, Doc. 101, ¶2.a.xx).

34.     Mr. Heuton was found to have low oxygen saturation by EMS when he was loaded into the ambulance. (*Stipulated fact*, Doc. 101, ¶2.a.xxi).

35.     While in the back of the ambulance, Mr. Heuton lost consciousness and went into pulseless electrical activity. (*Stipulated fact*, Doc. 101, ¶2.a.xxii).

36.     Mr. Heuton herniated and suffered brain death on or before March 8, 2022. (Deposition of Dr. Gary Vilke [cited excerpts attached as Exhibit G], pgs. 47-48).

37.     Dr. Jonathan Parsons, Plaintiffs' pulmonologist expert witness, reflected that Mr. Heuton's March 7, 2022, presentation showed that he had "numerous pulmonary complications related to his COVID infection." (Deposition of Dr. Jonathan Parsons [cited excerpts attached as Exhibit H], pg. 56.)

38.    Dr. Parsons also testified that Mr. Heuton's death was causally connected to his COVID-19 illness and the resulting secondary conditions. (Parsons depo., Ex. H, pg. 93).

39.    Dr. Chris Fox, Plaintiffs' emergency medicine expert witness, testified that "COVID-19 probably caused some damage to [Mr. Heuton's] lungs and is what resulted later in hypoxia." (Deposition of Dr. Chris Fox [cited excerpts attached as Exhibit I], pg. 31).

40.    Dr. Fox further opined that Mr. Heuton's hypoxemia to a degree of medical certainty stemmed from the COVID injury to Mr. Heuton's lungs and his pulmonary embolism. (Fox depo., Ex. I, pg. 72).

41.    Dr. Parsons recognized that pulmonary embolism is a known complication of COVID-19 infections because COVID-19 "had a very prothrombotic tendency, causing blood clots in patients. That was one of the biggest causes of death." (Parsons depo., Ex. H, pg. 145-46).

42.    Dr. Cregg Ashcraft, Plaintiffs' internal medicine expert witness, testified that it was "absolutely right" that Mr. Heuton's fibrosis, possible small airway disease, and pulmonary embolism were related to his COVID-19. (Deposition of Dr. Cregg Ashcraft [cited excerpts attached as Exhibit J], pg. 113.)

43.    Dr. Ashcraft further testified that Mr. Heuton's hypoxia on March 7, 2022, was the product of his COVID-19 illness or its secondary conditions. (Ashcraft depo., Ex. J, pg. 133).

44.    Mr. Heuton's Certificate of Death list "previous COVID viral pneumonia" and "previous tracheostomy status post reversal" as other significant conditions contributing to his death.[2] (Certificate of Death for Andew J. Heuton attached as Exhibit K).

---

[2] The State of Kansas requires that forms of certificates, such as a certificate of death, "shall include as a minimum the items required by the respective standard certificates as recommended by the national office of vital statistics." K.S.A. § 65-2415. Guidance from the National Vital Statistics System provides that "other significant conditions that contributed to the death," but are not a part of the immediate sequence of events should be reported under the cause of death. *Guidance for Certifying Deaths Due to Coronavirus Disease 2019 (COVID-19), available at* https://www.cdc.gov/nchs/data/nvss/vsrg/vsrg03-508.pdf.

## ARGUMENTS AND AUTHORITIES

### I.    Governing standards

#### A.  Summary judgment standard.

Summary judgment "is an important procedure designed to secure the just, speedy and inexpensive determination of every action." *Freeman v. Benson*, Case No. 16-3127-DDC-TJJ, 2017 WL 5731295, at *6 (D. Kan. Nov. 28, 2017) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)). "One of the principal purposes of summary judgment is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose." *Larocca v. Walmart Stores, Inc.*, Case No. 14-4106-JPO, 2015 WL 1816053, at *2 (D. Kan. Apr. 22, 2015).

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which the nonmoving party carries the burden of proof. *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990).

#### B.  Sovereign Immunity

The United States is immune from civil suits, absent its consent to suit.  The FTCA "provides a limited waiver of sovereign immunity."  *Ball v. United States*, 967 F.3d 1072, 1075 (10th Cir. 2020); *see also* 28 U.S.C. §§ 1346, 2671-80.  This waiver "must be strictly construed, in terms of its scope, in favor of the sovereign," and the party alleging the waiver "bears the burden to prove a waiver." *Ohlsen v. United States*, 991 F.3d 1143, 1154 (10th Cir. 2021) (quotations and citations omitted).

The FTCA provides: "The United States shall be liable . . . in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages."[3]  28 U.S.C. § 2674.  Thus, the United States is liable only "*under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred*." 28 U.S.C. § 1346(b)(1) (emphasis added). This limitation has been referred to as "the conditions precedent to the United States' waiver of sovereign immunity in the FTCA." *Hill v. SmithKline Beecham Corp*, 393 F.3d 1111, 1118 (10th Cir. 2004). Thus, "[the FTCA] waives the federal government's sovereign immunity but only when a plaintiff would have a viable claim against a private party in that jurisdiction." *Zeiner v. United States through Dep't of Veteran Affs.*, No. 24-1131-JWB, 2025 WL 859808, at *3 (D. Kan. Mar. 19, 2025)

## II.    The United States is immune from liability under K.S.A. § 60-5503 and, thus, has not waived its sovereign immunity.

In response to the COVID-19 global pandemic and the uncertainty that followed, the State of Kansas enacted the COVID-19 Response and Reopening for Business Liability Protection Act (CRRBLPA). The CRRBLPA, among other things, provides immunity from liability and damages for healthcare providers in Kansas.

Under § 5503 of the CRRBLPA, a "healthcare provider" is immune from "civil liability . . . for acts, omissions, healthcare decisions or the rendering of or the failure to render healthcare services, including services that are altered, delayed or withheld, as a direct response to the COVID-19 public health emergency," K.S.A. § 60-5503(a), if the following conditions are met:

---

[3] There are exceptions not relevant here.  For example, Congress does not allow punitive damages or prejudgment interest against the United States even if available against a private party.  28 U.S.C. § 2674.  Congress also enacted exceptions where the United States may not be held liable even if a private party would be liable.  *See* 28 U.S.C. § 2680.  These exceptions further support that Congress did not intend for the United States's potential liability to be *greater* than that of a private person.

> (1) the claim "arise[s] out of or relate[s] to acts, omissions or healthcare decisions" that are "related to the COVID-19 public health emergency," *id.* § 60-5503(b);
>
> (2) the conduct at issue occurred between March 12, 2020, and March 31, 2022, *id.*;
>
> (3) the conduct at issue did not amount to "gross negligence or willful, wanton or reckless conduct," *id.* § 60-5503(c)(1); and
>
> (4) to the extent that the rendering of "healthcare services" unrelated to COVID-19 are at issue, such unrelated services had been "altered, delayed or withheld as a direct response to the COVID-19 public health emergency," *id.* § 60-5503(c)(2).

Plaintiffs do not allege in the Pretrial Order that Dr. Jordan's acts, omission, or healthcare decisions amounted to "gross negligence or willful, wanton, or reckless conduct." *See* (Doc. 101).[4] Nor do any experts opine that Dr. Jordan's actions were grossly negligent or reckless, which would be required in this medical negligence case to overcome the immunity granted in the CRRBLPA. And there is no dispute that the relevant acts, omissions, or healthcare decisions occurred on March 7, 2022, which is within the relevant period. Thus, the Court's sole task is to determine whether the "acts, omissions, or healthcare decisions" in this case are "related to the COVID-19 public health emergency."

The Tenth Circuit's recent decision in *Loginov v. Sheridan Mem'l Hosp.*, No. 24-8032, 2025 WL 1904470 (10th Cir. July 10, 2025) provides helpful guidance. In *Loginov*, the plaintiff was hospitalized three times in late 2021 after testing positive for COVID-19. During his first admission, he was treated for hyponatremia—a condition involving low sodium levels—through sodium repletion therapy. He was discharged but returned days later with neurological symptoms.

---

[4] Since the Court's Pretrial Order controls course of action, any claims, issues, defenses, or theories of damages not included in the Pretrial Order are waived at trial. *Weyerhaeuser Co. v. Brantley,* 510 F.3d 1256, 1267 (10th Cir.2007) (stating that a pretrial order supersedes the pleadings and controls the subsequent course of litigation); *Wilson v. Muckala,* 303 F.3d 1207, 1215 (10th Cir.2002) ("[C]laims, issues, defenses, or theories of damages not included in the pretrial order are waived.").

An MRI initially appeared normal, and he was discharged again. Shortly thereafter, a radiologist identified signs of demyelination on the MRI, but Loginov declined to return when contacted. On his third admission, Loginov again presented with slurred speech and difficulty swallowing. Loginov later sued the hospital, alleging that the sodium repletion treatment was negligently administered and caused him to develop osmotic demyelination syndrome (ODS). The district court granted summary judgment in favor of the hospital, concluding that it was immune under Wyoming's COVID-19 immunity statute.

Loginov appealed the district court's decision arguing, among other things, that the Tenth Circuit should not apply the plain language of Wyoming's COVID-19 immunity statute because it would yield an "absurd" result—granting immunity for nearly all claims against health care providers, including in cases unrelated to COVID-19. *Loginov*, 2025 WL 1904470, at *6. The Tenth Circuit declined to resolve whether Wyoming's COVID-19 immunity statute required a nexus to the treatment of COVID-19 because Loginov's claim was related to COVID-19. In pertinent part, the Tenth Circuit reasoned that Loginov's hyponatremia is a condition caused by COVID-19. *Id*. The hospital's sodium repletion therapy, thus, was "an act 'by a health care facility or provider in arranging for or providing [***COVID-19-related***] health care services or medical care to the claimant that resulted in injury to [] the claimant.'" *Id*. (citation omitted and emphasis added). *Loginov* therefore establishes that the treatment of secondary conditions like hyponatremia (and even second-level complications like ODS) are "related to" COVID-19 because the virus caused or contributed to the complication.

The Tenth Circuit's reasoning in *Loginov* is consistent with how courts have broadly interpreted the phrase "related to" in other settings. *See*, *e.g.*, *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013) (stating that "related to" means having a connection with, directly or

indirectly); *Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 38 (1996) (describing "relates to" in other contexts as "highly general" and expressing "a connection with or reference to"); *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 97 (1983) ("A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan."); *Tyco Healthcare Group LP v. Ethicon Endo-Surgery*, 587 F.3d 1375, 1378 (Fed. Cir. 2009) (recognizing that "[i]n general, 'related to' means one thing has some . . . connection to another thing," and "[i]n legal parlance," the term has "similar breadth"); *Beiser v. Weyler*, 284 F.3d 665, 669 (5th Cir. 2002) (explaining that "relates to" means "having a 'connection with' or 'reference to'" and describing it as a "low bar."); *Ficarra v. SourceAmerica*, No. 1:19-CV-01025, 2020 WL 1606396, at *4 n. 2 (E.D. Va. Apr. 1, 2020) (citing three dictionary definitions and concluding "related to" means "an association or connection between two or more things"); *Deal Wireless, LLC v. Selective Way Ins. Co.*, No. CV 15-14280, 2016 WL 6651798, at *2 (E.D. Mich. May 4, 2016) ( "relates to" in Fed. R. Civ. P. 26(b)(4)(C) means the matter in question "has a connection with or reference to"); *see also Relate*, Black's Law Dictionary (12th ed. 2024) (defining "relate" as "[t]o have some connection to; to stand in relation to").

Here, following the logic of *Loginov*, Dr. Jordan's alleged acts, omissions, and healthcare decisions on March 7, 2022, "relate[] to" the COVID-19 public health emergency because he was treating secondary complications that resulted from and were directly connected to Mr. Heuton's severe COVID-19 illness. It is undisputed that (1) Mr. Heuton had previously tested positive for COVID-19; (2) he suffered severe complication from his COVID-19 illness, including prolonged intubation and pulmonary issue; (3) Dr. Jordan treated Mr. Heuton for hypoxemia/hypoxia that was allegedly related to those pulmonary issues; and (4) Mr. Heuton's hypoxemia/hypoxia and pulmonary issues were caused by the secondary conditions resulting from his severe COVID-19

illness. Indeed, the Plaintiffs' experts in this case testified that the likely conditions causing Mr. Heuton's hypoxemia/hypoxia on March 7, 2022—fibrosis, pulmonary embolism, small airway disease, and tracheal stenosis—and his death were causally connected and secondary to his severe COVID-19 illness. Dr. Parsons agreed that Mr. Heuton's death was causally connected to his COVID-19 illness and the resulting secondary conditions. (SOF, ¶ 34). He also testified that Mr. Heuton's March 7, 2022, presentation showed that he had "numerous pulmonary complications related to his COVID infection." (SOF, ¶ 35). Dr. Fox testified that "COVID-19 probably caused some damage to [Mr. Heuton's] lungs and is what resulted later in hypoxia." (SOF, ¶ 36). Dr. Fox further opined that Mr. Heuton's hypoxemia stemmed from the COVID injury to Mr. Heuton's lungs and his pulmonary embolism, which is a condition known to be caused by COVID. (SOF, ¶¶ 37 & 38). Dr. Ashcraft testified that it was "absolutely right" that Mr. Heuton's fibrosis, possible small airway disease, and pulmonary embolism were related to his COVID-19. (SOF, ¶ 39). Dr. Ashcraft further testified that Mr. Heuton's hypoxia on March 7, 2022, was the product of his COVID-19 illness or its secondary conditions. (SOF, ¶ 40).

Under *Loginov*, Mr. Heuton's claim is one that "arises out of or relates to acts, omissions or healthcare decisions" (the differential diagnosis and decision to discharge) by a "healthcare provider" (Dr. Jordan) that "related to the COVID-19 public health emergency" (treatment of Mr. Heuton's secondary COVID-19 complications) and occurred between March 12, 2020, and March 31, 2022 (March 7, 2022). Because Dr. Jordan's treatment of Mr. Heuton is "related to the COVID-19 public health emergency," the United States is entitled to immunity from liability and damages under K.S.A. § 60-5503. Given this statutory immunity from liability and damages, Plaintiffs' claims in this case also do not fall with the United States's limited waiver of sovereign immunity under the FTCA.

14

## **CONCLUSION**

The undisputed record shows that Dr. Jordan's treatment on March 7, 2022, addressed secondary complications directly caused by Mr. Heuton's severe COVID-19 illness. Indeed, Plaintiffs' own experts confirm the causal connection to COVID-19. Under K.S.A. § 60-5503, that care is "related to" the COVID-19 public health emergency.  For the above stated reasons, the United States respectfully requests that the Court enter judgment in the United States's favor finding that it is immune from liability and damages under K.S.A. § 60-5503 and that the United States has not waived sovereign immunity for these claims.

Respectfully submitted,

RYAN A. KRIEGSHAUSER
United States Attorney
District of Kansas

*s/ Brian E. Vanorsby*
Brian E. Vanorsby, KS #27606
Assistant United States Attorney
301 N. Main, Suite 1200
Wichita, Kansas 67202
Telephone: (316) 269-6103
Facsimile: (316) 269-6484
E-mail: brian.vanorsby@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2025, the foregoing was electronically filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all CM/ECF participants.


s/ *Brian E. Vanorsby*
Brian E. Vanorsby
Assistant United States Attorney