IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JAMIE HEUTON, individually and as
administrator of the estate of Andrew
Heuton and as next friend of A.H.,
ASHLEY HEUTON, and ANDREW
HEUTON, JR.,

                      Plaintiffs,

v.

UNITED STATES OF AMERICA,

                      Defendant.

Case No. 24-2065-DDC

**MEMORANDUM AND ORDER**

      Plaintiffs asserted wrongful death and survival claims against defendant United States of America under the Federal Tort Claims Act (FTCA). Now, plaintiffs ask the court to approve the settlement they have reached with defendant. Doc. 126. The court commends the parties' efforts to resolve this case. Unfortunately, though the court finds the proposed settlement apportionment doesn't comply with governing law. And so, it denies plaintiffs' Application for Approval of Wrongful Death Settlement (Doc. 126) without prejudice to refiling a revised form of compromise. The court explains its conclusion below, starting with a brief overview of the facts of this case.

I.      **Background Facts**

      Andrew Heuton died on March 10, 2022—a few days after receiving medical care at Irwin Army Community Hospital (IACH) in Fort Riley, Kansas. Doc. 15 at 5–6 (Am. Compl. ¶¶ 28–31, 34). Plaintiffs—asserting they were decedent's "spouse," two adult children, one

minor child, and his estate—allege that his death resulted from negligent medical care. Plaintiffs thus asserted wrongful death and survival claims against the United States under the FTCA. *Id.* at 6–8, 10–11 (Am. Compl. ¶¶ 35–39, 51–56). Plaintiffs also asserted claims against individual physicians and a healthcare association. *Id.* at 2–3, 8–10 (Am. Compl. ¶¶ 9–11, 40–50). But plaintiffs stipulated to dismissing all claims against these other defendants. Doc. 80. So, only the United States remains as a defendant in the case. *See* Doc. 114 at 3 n.1.

Now, the parties have signed a Stipulation for Compromise Settlement and Release of Federal Tort Claims Act Claims. Doc. 126-1. The Stipulation provides that the United States will pay plaintiffs $1 million in exchange for a release by plaintiffs. *Id.* at 2, 4 (Settlement ¶¶ 3, 4). So, plaintiffs filed an Application for Approval of Wrongful Death Settlement (Doc. 126) with the court. The Application contends that decedent is "survived by his common law wife, Jamie Heuton[,]" as well as two adult children and a minor child. *Id.* at 1–2. Plaintiffs thus ask the court to approve an equal apportionment (25%) of the settlement proceeds, after payment of attorneys' fees, among the following four individuals: Jamie Heuton ("common law wife"); Ashley Heuton (daughter); Andrew Heuton, Jr. (son); and A.H. (minor son). *Id.* at 3. But plaintiffs' request raises an unresolved issue the parties disputed at an earlier stage of this litigation: was Jamie Heuton decedent's common-law wife?

The Amended Complaint identifies Jamie Heuton as decedent's "lawful spouse." Doc. 15 at 1 (Am. Compl. ¶ 1). But in its motion-to-dismiss briefing, the United States contested her status as a spouse and, therefore, her status as a lawful heir. The parties agreed that Jamie Heuton and decedent were married from 2000 to 2017—when they divorced. Doc. 48-3 at 5–6 (J. Heuton Dep. 16:5–17:8); Doc. 48-4 at 3–4 (Def. Ex. C) (state court decree reciting year of marriage and decreeing divorce). But the parties disputed whether the two were reunited in a

common-law marriage at decedent's death. Doc. 54 at 3–6; Doc. 59 at 2–3. The court dismissed Jamie Heuton's wrongful death claim for lack of administrative exhaustion under the FTCA. Doc. 114 at 17. So, the court didn't reach the dispute whether Jamie Heuton qualifies as an heir. *Id.* at 17 n.6. Now—to decide plaintiffs' proposed settlement apportionment—it must.

Approving the apportionment while Jamie Heuton's status as an heir remains unresolved presents two problems, explained more fully later in this Order, but previewed now. *First*, her status as spouse—or not—determines whether she qualifies as an heir capable of recovering under the Kansas Wrongful Death Act (KWDA). The court can't approve a settlement that apportions proceeds to a non-heir. *Second*, one of the other heirs, A.H., is a minor. When a settlement involves a minor, the court must determine that the settlement serves the minor's best interests. If Jamie Heuton doesn't qualify as an heir under the KWDA, A.H. could receive one-third of the settlement proceeds, instead of one-fourth. A larger portion of the proceeds—arguably—is in A.H.'s best interests. So, the court must resolve whether Jamie Heuton is an heir not only to comply with KWDA requirements, but also to protect A.H.'s best interests. The court undertakes this task, below. But first it explains why Kansas law governs its analysis.

## II.     Choice of Law

The FTCA explicitly incorporates state law when it provides that the United States is "liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); *see also Harvey v. United States*, 685 F.3d 939, 950 (10th Cir. 2012) ("[T]he FTCA mandates application of the law of the place to resolve questions of substantive liability." (quotation cleaned up)). "The phrase 'law of the place' refers to the law of the State where the act or omission occurred." *Mecca v. United States*, 389 F. App'x 775, 779 (10th Cir. 2010). And "under the FTCA, the government is to be treated 'in the same manner and to the same extent as a private individual under like circumstances' depending on the law of

3

the state where the tort occurred." *Hill v. United States*, 81 F.3d 118, 120 (10th Cir. 1996) (quoting 28 U.S.C. § 2674).

So, state law governs approval of the settlement agreement here. *See Lewis v. Charter Twp. of Flint*, 767 F. App'x 591, 594 (6th Cir. 2019) ("When a settlement arises out of a wrongful-death claim pursuant to the forum state's wrongful-death statute, state law governs distribution of the settlement proceeds."); *Reo v. U.S. Postal Serv.*, 98 F.3d 73, 76 (3d Cir. 1996) ("Courts uniformly look to state law to determine the validity of settlements entered between the government and the claimant . . . after [an FTCA] suit has been commenced."). State law likewise governs who may recover settlement proceeds. *See Necklace v. U.S. ex rel. Bureau of Indian Affs.*, No. CIV. 06-4274, 2008 WL 4500000, at *2 (D.S.D. Oct. 7, 2008) ("Since the accident which is the basis of this Federal Tort Claims action occurred in South Dakota, South Dakota law applies in determining the beneficiaries under the South Dakota Wrongful Death Statutes."). So, the court applies the KWDA to the settlement apportionment at issue here.

### III.      Wrongful Death Settlement

The KWDA identifies the court's role in a Kansas wrongful death settlement under Kan. Stat. Ann. § 60-1905. The full text of § 60-1905 provides:

> The net amount recovered in any such action, after the allowance by the judge of costs and reasonable attorneys fees to the attorneys for the plaintiffs, in accordance with the services performed by each if there be more than one, shall be apportioned by the judge upon a hearing, with reasonable notice to all of the known heirs having an interest therein, such notice to be given in such manner as the judge shall direct. The apportionment shall be in proportion to the loss sustained by each of the heirs, and all heirs known to have sustained a loss shall share in such apportionment regardless of whether they joined or intervened in the action; but in the absence of fraud, no person who failed to join or intervene in the action may claim any error in such apportionment after the order shall have been entered and the funds distributed pursuant thereto.

The Kansas Wrongful Death Act thus requires the court to apportion the recovery after conducting a hearing. *Id.* It provides that the court, first, should allow costs and reasonable

4

attorneys' fees for plaintiffs' counsel. *Id.* The Act then directs the court to apportion the recovery among the heirs in proportion to the loss sustained by each one. *Id.*; *see also Flowers v. Marshall*, 494 P.2d 1184, 1187 (Kan. 1972) (explaining that the statute "provides for an apportionment among the heirs of any amount recovered to be made by the trial court according to the loss sustained by each"). Appropriate apportionment in this case comes down to this question: Who has a right to partake in the apportionment? And this question implicates Jamie Heuton's status as an heir.

The KWDA requires that the apportionment in a wrongful death action "be in proportion to the loss sustained by each of the heirs[.]" Kan. Stat. Ann. § 60-1905. And the Kansas Supreme Court has clarified that the "wrongful death action authorized by 60-1901 et seq., is for the *exclusive* benefit of the heirs[.]" *Mason v. Gerin Corp.*, 647 P.2d 1340, 1343 (Kan. 1982) (emphasis added). A "decedent's surviving spouse . . . qualifies as an heir-at-law and has standing to bring a wrongful death lawsuit." *Heimerman v. Rose*, No. 13-2480-CM, 2014 WL 2711904, at *2 (D. Kan. June 16, 2014). But what about someone who presents herself as a common-law spouse?

"The Kansas Supreme Court has construed the term 'heirs at law' [in the KWDA] to be synonymous with the term 'heirs' as construed under the intestate succession laws." *DeWitt ex rel. Kemper v. Frenchie's Custom Helmets*, No. 93-2332-JWL, 1994 WL 171571, at *2 (D. Kan. Apr. 1, 1994) (quotation cleaned up). "Since Kansas recognizes the common-law marriage doctrine, common-law spouses have the same rights as spouses under the laws of intestate succession[.]" *In re Est. of Jerome P. Dougherty*, No. 73,240, 1995 WL 18253677, at *4 (Kan. Ct. App. Dec. 8, 1995). Thus, if Jaime Heuton qualifies as a common-law spouse, she's an "heir" and may recover under the Act. The dispositive question, therefore, asks whether the

relationship between Jamie Heuton and decedent met the requirements of a common-law marriage under Kansas law.

### A.     Common-Law Marriage

The Kansas Supreme Court recently reiterated the three essential elements of a common-law marriage in Kansas. *See In re Marriage of Heidkamp & Ritter*, 526 P.3d 669, 671 (Kan. 2023). They include: "(1) capacity of the parties to marry; (2) a present marriage agreement between the parties; and (3) a holding out of each other as husband and wife to the public." *Id.* "Each element must coexist to establish a common-law marriage." *In re Est. of Smith*, No. 98,397, 2008 WL 1868685, at *3 (Kan. Ct. App. Apr. 25, 2008) (citing *Fleming v. Fleming*, 559 P.2d 329 (Kan. 1977)). The party who asserts a common-law "marriage bears the burden of proving the existence of the marriage." *Heidkamp*, 526 P.3d at 671.

Where "some evidence indicates a common-law marriage, but that evidence conflict[s] with other evidence[,]" Kansas courts often find no common-law marriage. *In re Est. of Crozier*, No. 75,701, 1996 WL 35070633, at *1, 2 (Kan. Ct. App. Oct. 25, 1996) (affirming probate court finding of no common law marriage where "the evidence was conflicting"); *see also In re Est. of Bizoe*, 539 P.3d 227, 2023 WL 8494579, at *7 (Kan. Ct. App. 2023) (affirming district court's finding of no common-law marriage where district court "acknowledged there was a great deal of conflicting testimony"); *In re Est. of Smith*, 2008 WL 1868685, at *4 (affirming district court's finding of no common-law marriage after "noting conflicting evidence regarding decedent's intent" and conflicting "manner in which [couple] defined their relationship in official business matters" compared with "more informal situations").

The court thus must assess whether Jamie Heuton has shouldered her burden to prove the requisite elements to establish a common-law marriage between herself and decedent. The court convened a settlement approval hearing on February 4, 2026. At the hearing, the United States

invoked its motion-to-dismiss briefing and stood by its position that Jamie Heuton was not decedent's common-law wife. On plaintiffs' side, Jamie Heuton and daughter, Ashley Heuton, testified to establish the marriage. Both parties also presented a limited number of documents, all previously submitted as exhibits with the motion-to-dismiss briefing. The documents presented by the United States indicated that decedent had represented himself as single. The documents presented by plaintiffs indicated just the opposite. Addressing the three requisite elements in light of the parties' conflicting evidence, the court concludes Jamie Heuton has failed her burden to establish the last two elements necessary to qualify as a common-law spouse. Start with the beginning of the list.

### 1.     Capacity of the Parties to Marry

The first common-law-marriage element requires that the parties have the capacity to marry. *Heidkamp*, 526 P.3d at 671. It involves "the ability to understand the marital contract, its duties, and responsibilities, no existing marriage, and the requisite age." *In re Maltbia*, No. 06-41166, 2008 WL 320327, at *5 (Bankr. D. Kan. Feb. 1, 2008) (quotation cleaned up). Neither party offered any argument about this first element. And nothing in the evidence presented led the court to question the parties' capacity. The court thus considers the first element uncontested and moves to the second.

### 2.     Present Marriage Agreement

The second element demands "a present marriage agreement between the parties, rather than an agreement to be married in the future." *Id.* Kansas courts have clarified that a "committed relationship is not an agreement to be married." *Budd v. Tanking*, 425 P.3d 373, 2018 WL 4262676, at *3 (Kan. Ct. App. 2018). Indeed, even "[c]ohabitation, coupled with a promise to marry, does not evidence a common law marriage." *In re Maltbia*, 2008 WL 320327, at *5. That's so because to establish a common-law marriage, "a couple must intend to *be*

7

married, not intend to *get* married." *In re Est. of Gray*, 526 P.3d 703, 2023 WL 2723263, at *4 (Kan. Ct. App. 2023) (emphasis in original).

During the settlement hearing, Jamie Heuton testified that she and decedent, together, had an agreement or understanding that they were married. And the couple's daughter, Ashley Heuton, confirmed the same—testifying that it appeared to her that her parents considered themselves married. Plaintiffs' counsel also pointed to an affidavit from decedent's sister, Amy Moorlag. Doc. 54-5 (Pl. Ex O).[1] In the affidavit, Ms. Moorlag attests that in 2021 and 2022 decedent and Jamie Heuton "consistently considered themselves husband and wife." *Id.* at 1 (Pl. Ex. O ¶ 9). And, she attests, although the couple had planned a future marriage ceremony, the couple "already considered themselves married." *Id.* at 2 (Pl. Ex. O ¶ 12). The couple simply viewed the forthcoming ceremony as "a celebration of their remarriage that had already occurred." *Id.*

But on cross examination, Jamie Heuton couldn't identify a date when—after the couple's divorce—the couple had agreed again to be married. She first explained that the couple never really considered themselves divorced and had tried to stop the 2017 divorce from becoming final. But then she conceded that the couple had lived apart for months after their divorce and that she had rented her own place from 2017 to 2019. She also conceded that decedent had applied for a marriage license in November 2021, just months before his death. And she agreed that the purpose of securing that marriage license was so that she and decedent could get married.

---

[1] With the exception of the settlement documents, any exhibits the parties presented at the hearing they had submitted to the court already in their motion-to-dismiss briefing. The court thus cites to the record established in the motion to dismiss proceedings when discussing those exhibits.

Jamie Heuton's inability to identify a date—or even a definitive timeframe—for the couple's present agreement to be married puts this second element on shaky ground. *See In re Maltbia*, 2008 WL 320327, at *5 (finding no common-law marriage, in part, because "the evidence of what date the parties formed that alleged agreement to marry is in serious conflict"). And the November 2021 marriage license application seals the deal. It evinces an intent to get married in the future. Such future intent suggests that the couple hadn't agreed they were married immediately after their divorce, as Jamie Heuton's testimony suggested. Indeed, an intent to get married undermines the existence of a present marriage agreement. *See In re Est. of Gray*, 2023 WL 2723263, at *4 ("[A] couple must intend to *be* married, not intend to *get* married."). Jamie Heuton thus hasn't shouldered her burden to demonstrate that the couple shared a present agreement to be married. But even if she had, the third common-law marriage element is likewise rife with conflicting evidence.

### 3. Holding Out as Husband and Wife to the Public

Kansas law also requires that a couple hold each other out as husband and wife to the public to qualify as common-law spouses. *Heidkamp*, 526 P.3d at 671. Activities which may constitute a holding out to the public include:

> cohabitation, using the same last name, filing joint tax returns, opening joint bank or savings accounts, joint ownership of property, pooling resources, the woman using the man's last name on a driver's license and in daily affairs, designating the other person as spouse and beneficiary on insurance policies, having children and generally gaining a reputation in the community as husband and wife.

*In re Maltbia*, 2008 WL 320327, at *5.

At the settlement hearing, Jamie Heuton testified that she and decedent held themselves out as husband and wife to healthcare providers and the government. Ashley Heuton, the couple's daughter, concurred. And plaintiffs' counsel demonstrated as much with some of decedent's medical records. For example, decedent's social history—taken at a hospital on

February 27, 2022—described decedent as "married and lives with his wife in Junction City, Kansas." Doc. 54-16 at 1 (Pl. Ex. Z). And decedent's records from another hospital visit—on March 7, 2022—identified his "status" as "M" for married and listed Jamie Dawn Heuton as his spouse and emergency contact. Doc. 54-14 (Pl. Ex. X); *see also* Doc. 54-10 (Pl. Ex. T) (hospital records listing decedent's marital status as "married").

But on cross examination it became clear that the couple—in some instances—had identified themselves to the public as single. *First*, the United States asked Jamie Heuton about the caregiver notes on decedent's medical record from January 28, 2022. The notes read: "[Decedent] is being transferred to Select Specialty Hospital on 1/29/22. Former spouse reports that she is unable to consent on [decedent's] behalf as they are now divorced[.]" Doc. 59-2 at 1–2 (Def. Ex. 2). In response, Jamie Heuton conceded that she had indicated to that medical provider that the couple wasn't married—just two months before decedent's death.

*Then*, the United States inquired about Jamie Heuton's earlier deposition testimony, which read as follows:

> Q. Did you ever get divorced?
> A. Yes.
> Q. When did you get divorced?
> A. In 2017.
> Q. Where was the divorce?
> A. Junction City.
> Q. Did you file or Andrew file?
> A. Andrew.
> Q. What was the principal motivation for Andrew for filing, if you know?
> A. We just wasn't getting along.
> Q. Did you reform your marriage? Did you get remarried?
> A. No.
> Q. So, when I say—when I earlier said your husband in reality as of the time of his passing you weren't married to Mr. Heuton?
> A. No.

Doc. 48-3 at 6 (J. Heuton Dep. 17:5–22). And, on recross, the United States elicited testimony from Jamie Heuton that decedent wasn't able to verbalize his marital status on March 7, 2022 due to his illness. So, the hospital records from that date only demonstrate Jamie Heuton's representation to the public of their marital status—not decedent's.

*Finally*, Jamie Heuton explained that, because the couple technically wasn't married, decedent sometimes had to identify as single—in legal situations—to avoid lying. In short, the court finds a tangled web of conflicting evidence about whether the couple held themselves out as married.

Further complicating the matter, the parties didn't present evidence at the hearing from many categories of activities that would help the court untangle that web. The parties never mentioned tax returns, joint bank accounts, joint property ownership, or insurance beneficiaries, for instance. So, on the record presented at the hearing, the court can't find that Jamie Heuton has established the third common-law marriage element. With neither the second nor the third elements established, the court concludes that Jamie Heuton hasn't shouldered her burden to establish that she was decedent's spouse at the time of his death. And without that status, she can't qualify as an heir who can recover in a wrongful death action under the KWDA. The court thus can't approve the proposed apportionment.

The KWDA heir requirement isn't the sole reason for the court's decision, however. It also can't approve the settlement as appropriate for decedent's minor son, A.H. It explains this second basis to deny plaintiffs' Application, next.

11

IV.     **Minor Settlement Approval**

Kansas law[2] treats minors "as persons under legal disability[.]" *In re Est. of Wise*, 890 P.2d 744, 749 (Kan. Ct. App. 1995). And so, a court must approve a settlement contract before the contract can bind a minor plaintiff. *Childs ex rel. Harvey v. Williams*, 757 P.2d 302, 303 (Kan. 1988); *see also Baugh v. Baugh ex rel. Smith*, 973 P.2d 202, 205 (Kan. Ct. App. 1999) ("[C]ourt approval is necessary in order to bind a minor to an agreement settling a wrongful death claim."). Kansas law requires courts "to exercise extensive oversight, ensuring that the injured minor's claims are not sold short by an agreed settlement merely outlined at a 'friendly' hearing." *White ex rel. White v. Allied Mut. Ins. Co.*, 31 P.3d 328, 330 (Kan. Ct. App. 2001). Courts "'may not simply rely on the fact that the minor's parents have consented to the proposed agreement. Instead, the court must determine whether the agreement is in the minor's best interests.'" *Id.* (quoting *Baugh*, 973 P.2d at 205). The Kansas Supreme Court has upheld a state trial court's approval of a settlement on a minor's behalf after "it engaged in a full examination of facts of the accident and extent of the minor's injuries." *Id.* (quotation cleaned up) (referring to *Perry v. Umberger*, 65 P.2d 280 (Kan. 1937)). And Kansas cases have quoted the Alabama Supreme Court's view that approval should be given not because there is agreement but, instead, "'because it appears from the evidence that the amount is just and fair'" and "'conservative of

---

[2]     Federal courts have exclusive jurisdiction over FTCA claims. *See* 28 U.S.C. § 1346(b)(1) (granting federal district courts exclusive jurisdiction over tort claims against the United States for money damages). In federal-question jurisdiction cases, our court has predicted that the Tenth Circuit would apply Kansas law in evaluating a settlement agreement involving a minor. *See, e.g.*, *T.Y. ex rel. P.Y. v. Shawnee Mission Sch. Dist. USD 512*, No. 17-2589-DDC-GEB, 2020 WL 59649, at *1 (D. Kan. Jan. 6, 2020) ("The court predicts that the Tenth Circuit would direct the court to apply Kansas law when, as here, it exercises federal question jurisdiction over a case involving a settlement on a minor's behalf."); *Edgin ex rel. I.E. v. Blue Valley Unified Sch. Dist. No. 229*, No. 20-2547-JPO, 2021 WL 4713047, at *1 (D. Kan. Sept. 20, 2021) (same); *S.C. ex rel. A.J. v. Lansing Unified Sch. Dist. #469*, No. 18-2228-DDC-JPO, 2019 WL 1762708, at *1 (D. Kan. Apr. 22, 2019) (same); *S.S. ex rel. L.S. v. Napolitano*, No. 18-2491-ADM, 2020 WL 489526, at *2 (D. Kan. Jan. 30, 2020) (applying Kansas law). It stands to reason that the same prediction would apply to an exclusive-jurisdiction case under the FTCA. The court thus applies Kansas law in evaluating the minor settlement.

the minor's interests.'" *Mo. Pac. Ry. Co. v. Lasca*, 99 P. 616, 618 (Kan. 1909) (quoting *Tenn. Coal, Iron & R.R. Co. v. Hayes*, 12 So. 98, 103 (Ala. 1892)).

Here, the court's duty to protect A.H.'s best interests supplies a second reason to deny plaintiffs' motion. Most evidently, where the apportionment includes a non-heir—both contravening Kansas law and reducing A.H.'s settlement recovery—it doesn't protect A.H.'s best interests. But even if the common-law-marriage analysis had turned out differently, the court would've had to deny plaintiffs' motion. That's so because the court would have harbored concerns about plaintiffs' attorneys laboring under a conflict of interest. Jamie Heuton's interest in establishing herself as an heir—and thus receiving one-fourth of the settlement—is potentially adverse to A.H.'s interest in receiving the largest portion of the settlement that he's entitled to receive under the law. And with no guardian ad litem serving to protect A.H.'s interest, the court couldn't have rubber-stamped an apportionment where the same counsel represents two potentially adverse parties.

In a nutshell, the court finds itself in a catch-22. If Jamie Heuton isn't an heir, A.H. is entitled to a greater portion of the settlement. If Jamie Heuton were an heir, then A.H. should have received independent advice from counsel devoted solely to his interests. Either way, the court doesn't find the settlement in A.H.'s best interests.

## V.     Conclusion

The court hasn't identified any concerns with the parties' Stipulation for Compromise Settlement and Release of Federal Tort Claims Act Claims (Doc. 126-1) or the amount it proposes. But it finds the apportionment of the agreed-upon settlement contravenes Kansas law. *First*, plaintiffs' Application apportions one-fourth of the settlement to Jamie Heuton, who hasn't established her status as decedent's common-law spouse. *Second*, the settlement apportionment thus isn't in the best interests of minor A.H. So, the court denies plaintiffs' motion. It will

address plaintiffs' other requested relief, namely the approval of costs and attorneys' fees, in the context of any revised motion the parties may present.[3]

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiffs' Application for Approval of Wrongful Death Settlement (Doc. 126) is denied without prejudice to refiling a revised apportionment of the agreed-upon settlement proceeds.

**IT IS FURTHER ORDERED THAT** if plaintiffs haven't filed a renewed motion within 30 days of this Order, the parties must file a joint status report to update the court on the state of their settlement.

**IT IS SO ORDERED.**

**Dated this 27th day of February, 2026, at Kansas City, Kansas.**

s/ Daniel D. Crabtree
**Daniel D. Crabtree**
**United States District Judge**

---

[3] The Allocation of Settlement Proceeds (Pl. Ex. 2) provided during the settlement hearing requests that the court reduce the settlement amount by $118,190.47 for "case expenses." "Kan. Stat. Ann. § 60-1905 allows the court to award counsel the reasonable costs incurred during the litigation." *Est. of Glaves v. Mapleton Andover LLC*, No. 21-1037-DDC, 2023 WL 5379540, at *5 (D. Kan. Aug. 22, 2023). But plaintiffs' counsel hasn't provided any details about the source of those requested costs. Parties often provide, for example, an itemized statement of their costs. *See Trotter v. Harris*, No. 16-4005-DDC, 2018 WL 1412065, at *3 (D. Kan. Mar. 21, 2018) (explaining that law firm submitted itemized statement of costs); *see also Martin v. FCA, US, LLC*, No. 16-2564-DDC-GLR, 2017 WL 1509662, at *3 (D. Kan. Apr. 27, 2017) (same). On the current record, the court lacks the information necessary to assess the requested costs. The court thus advises plaintiffs' counsel ahead of any future revised motion that counsel needs to supplement its request for costs.